Charles G. COPELIN, Appellant,

v.

STATE of Alaska, Appellee.

Joe Ray MILLER, Appellant,

v.

ANCHORAGE, a Municipal Corporation, Appellee.

Nos. 5453, 5708.

Supreme Court of Alaska.

Feb. 18, 1983.

---

Daniel Westerburg and Stanley Lewis, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, for appellant Copelin.

Jeffrey M. Feldman and James D. Gilmore, Gilmore and Feldman, Anchorage, for appellant Miller.

Elizabeth H. Sheley, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellee State of Alaska.

David G. Berry, Municipal Prosecutor, Theodore D. Berns, Municipal Atty., Anchorage, for appellee Anchorage.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

In separate cases, Charles G. Copelin and Joe Ray Miller were convicted of violating state and municipal drunken driving prohibitions. These convictions were upheld by the Court of Appeals.[1] We granted Copelin and Miller's petitions for hearing[2] in order to review whether the police may refuse the request of one who is arrested for driving while intoxicated to consult an attorney before deciding whether to submit to a breathalyzer test. A second issue, raised only in the case of Copelin, is whether a

judge may consider one's refusals to submit to such breathalyzer tests in sentencing proceedings.

■ We have concluded that when a person is arrested for operating a motor vehicle in violation of state or local drunken driving ordinances, and requests to contact an attorney, AS 12.25.150(b) and Alaska Criminal Rule 5(b) require that the arrestee be afforded a reasonable opportunity to do so before being required to decide whether or not to submit to a breathalyzer test. Where, as here, the arrestee is denied that opportunity, subsequently obtained evidence must be suppressed, and we accordingly reverse these two cases.

## FACTS

On September 16, 1979, Charles G. Copelin was arrested for operating a motor vehicle while under the influence of intoxicating liquor in violation of state law. AS 28.35.030.[3] On April 16, 1979, Joe Ray Miller was arrested for operating a motor vehicle while his blood alcohol level exceeded .10 percent, in violation of a municipal ordi-

1. *Copelin v. State,* 635 P.2d 492 (Alaska App. 1981); *Miller v. Anchorage,* Summ. Disp. No. 54 (Alaska App., November 5, 1981).

2. AS 22.07.030 and Appellate Rule 302(a)(1).

3. Former AS 28.35.030, under which Copelin was charged, reads as follows:
 "Driving while under the influence of intoxicating liquor or drugs. (a) A person who, while under the influence of intoxicating liquor, depressant, hallucinogenic or stimulant drugs or narcotic drugs as defined in AS 17.10.230(13) and AS 17.12.150(3) operates or drives an automobile, motorcycle or other motor vehicle in the state, upon conviction, is punishable by a fine of not more than $1,000, or by imprisonment for not more than one year, or by both and the court shall impose a minimum sentence of imprisonment of not less than three consecutive days. Upon a subsequent conviction within five years after a conviction under this section, the court shall impose a minimum sentence of imprisonment of not less than 10 consecutive days. The execution of sentence may not be suspended nor may probation or parole be granted until the minimum imprisonment provided in this section has been served, nor may imposition of sentence be suspended, except

upon the condition that the defendant be imprisoned for no less than the minimum period provided in this section, nor may the punishment provided for in this section be reduced under AS 11.05.150. In addition, his operator's license shall be revoked in accordance with AS 28.15.210(c). In addition a person convicted under this statute shall undertake, for a term specified by the court, that program of alcohol education or rehabilitation which the court, after consideration of any information compiled under (b) of this section, finds appropriate.
 (b) Except as prohibited by federal law or regulation, every provider of treatment programs to which persons are ordered under (a) of this section shall supply the Alaska court system with the information regarding the condition and treatment of those persons as the supreme court may require by rule. Information compiled under this subsection is confidential and may only be used by a court in sentencing a person convicted under (a) of this section, or by an officer of the court in preparing a presentence report for the use of the court in sentencing a person convicted under (a) of this section."

nance Anchorage, Alaska Municipal Code § 9.28.030 (1978).[4]

Following their traffic stops both Copelin and Miller were taken into custody and transported to law enforcement headquarters. Both Copelin and Miller were asked to submit to breathalyzer examinations and both responded to this request by expressing a desire to contact their attorneys first. Permission was denied. Both Copelin and Miller were told that they did not have the right to contact counsel until after they decided whether to take the test.[5]

Copelin did not take the breathalyzer test, did not perform requested field sobriety tests, and was videotaped throughout this refusal. Miller did take the breathalyzer test. Following their respective arraignments, Copelin moved to suppress the videotape of his actions and Miller moved to suppress the results of his breathalyzer test. These motions produced conflicting results in the district and superior courts and eventually made their way to the Court of Appeals.[6] The Court of Appeals affirmed the convictions of both Copelin and Miller, holding that there was no error in the failure to suppress Copelin's videotape, no error in the failure to suppress Miller's breathalyzer test results, and no error in considering Copelin's past refusals to submit to breathalyzer tests in imposing sentence.

## STATUTORY RIGHT

· Copelin and Miller contend that they had a statutory right of access to counsel which was violated by law enforcement officers' denial of their requests to speak with their attorneys. We agree.

4. Former ANCHORAGE, ALASKA MUNICIPAL CODE § 9.28.030 (1978), under which Miller was charged, reads as follows:

"*Driving with 0.10% or greater blood alcohol.*

A. It shall be unlawful for any person to operate, drive or be in actual physical control of an automobile, motorcycle or other motor vehicle in the municipality at such time as there is 0.10% or more by weight of alcohol in his blood, or 100 milligrams or more of alcohol per 100 milliliters of his blood, or 0.10 grams or more of alcohol per 210 liters of his breath.

B. To be considered valid under the provisions of this section, a chemical analysis of the person's breath shall have been performed according to methods approved by the Alaska Department of Health and Social Services. If it is established at trial that a chemical analysis of breath was performed according to techniques, methods and standards of training approved by the Alaska Department of Health and Social Services, there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary."

5. Copelin was not permitted to contact anyone until nearly seven hours after his arrest. Miller was told, "You can call an attorney after you blow in the Breathalyzer."

6. COPELIN

On October 29, 1979, Copelin's motion was partially granted as the district court ordered some sections of the audio portion of the videotape turned off during playback. Interrogation by the officer in violation of *Miranda* and Copelin's "refusal" to take the breath test were not heard by the jury. The jury did see a very angry, hostile, and frustrated Copelin as he repeatedly asked to speak with his attorney and the officer repeatedly told him he could not. On November 15, 1979, the jury returned a verdict of guilty. After considering Copelin's refusals to submit to breathalyzer examinations on three separate occasions (including the present one) Copelin was sentenced by the district court. Copelin appealed to the superior court where the district court's judgment and sentence were affirmed on June 26, 1980. An appeal was filed in this court, and the matter was transferred to the Court of Appeals.

MILLER

On June 21, 1979, Miller entered a plea of nolo contendere to the .10 charge of the complaint, preserving the right to litigate and, if necessary, appeal, the issues raised in his pretrial motion to suppress pursuant to *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). On August 13, 1979, the district court granted Miller's motion to suppress, set aside his plea, and dismissed the case. The Municipality of Anchorage then petitioned the superior court to review the district court's order granting the motion to suppress. On November 28, 1979, the superior court reversed the order of the district court, and remanded the case for the imposition of sentence. On November 6, 1980, the nolo contendere plea was reinstated, a judgment of conviction was entered, and Miller was sentenced. Miller then appealed to the superior court. Because the issue had already been considered by that court upon the Municipality's petition for review, further proceedings were transferred to the Court of Appeals.

■ AS 12.25.150 sets forth the rights of a prisoner after arrest. Subsection (b) of that statute provides:

> "*Immediately* after an arrest, a prisoner shall have the right to telephone or otherwise communicate with his attorney and any relative or friend, and any attorney at law entitled to practice in the courts of Alaska shall, at the request of the prisoner or any relative or friends of the prisoner, have the right to *immediately* visit the person arrested." (Emphasis added).

The language of this statute is clear and unambiguous and mandates that every arrestee have the right to telephone or otherwise communicate with his attorney immediately.[7] This mandate was viewed by the legislature as sufficiently important to warrant criminal and civil penalties for its willful or negligent violations.[8]

Relying on this court's interpretation of AS 12.25.150(b) in *Eben v. State,* 599 P.2d 700 (Alaska 1979), the Court of Appeals found Copelin and Miller's invocation of that statute to be misplaced.[9] In *Eben,* we stated:

> "[AS 12.25.150(b)] is not concerned with implementing an arrestee's right to consult privately with his or her attorney, but with right to contact an attorney, relative or friend for the purpose of arranging bail or legal representation."

*Id.* at 710 n. 27.

However, there is nothing in the language of the statute which suggests any limitations on the type or nature of communication which an arrestee may have with his attorney following arrest. In fact, in *Eben,* this court noted:

> "[W]e caution that to the extent deemed appropriate in light of the circumstances, law enforcement officials should administer AS 12.25.150(b) in a manner which will permit a prisoner to communicate in privacy with his attorney, relative, or friend."

*Id.* By recommending that private communication be allowed where feasible, this court implicitly recognized that the opportunity to consult and communicate with an attorney and to receive legal advice was also a contemplated purpose of the statute.[10] To the extent that language in *Eben* indicates that the *sole* purpose of AS 12.25.-150(b) is to aid an arrestee in the attainment of bail or legal representation, it is

---

**7.** This statute is paralleled by Alaska Criminal Rule 5(b):

> "Rights of Prisoner to Communicate with Attorney or Other Person. *Immediately* after his arrest, the prisoner shall have the right *forthwith* to telephone or otherwise to communicate with both his attorney and any relative or friend. Any attorney at law entitled to practice in the courts of Alaska, at the request of either the prisoner or any relative or friend of the prisoner, shall have the right *forthwith* to visit the prisoner in *private.*" (Emphasis added).

**8.** AS 12.25.150 continues:

> "(c) It shall be unlawful for any officer having custody of a person so arrested to willfully refuse or neglect to grant any prisoner the rights provided by this section. A violation of this section is a misdemeanor, and, upon conviction, the offender is punishable by a fine of not more than $100, or by imprisonment for not more than 30 days, or by both.
> (d) In addition to the criminal liability in (c) of this section, an officer having a prisoner in custody who refuses to allow an attorney to visit the prisoner when proper application is made therefor shall forfeit and pay to

the party aggrieved the sum of $500, recoverable in a court of competent jurisdiction."

**9.** The defendant in *Eben* was arrested and booked on a double homicide charge. At the police station, after being advised of his rights, the defendant told police that he would sign the rights waiver form after he had telephoned his girlfriend. The officers remained in the room during the defendant's telephone conversation and heard the defendant utter incriminating statements. This court rejected the defendant's argument that statements made during the exercise of an arrestee's right under AS 12.25.150(b) to "telephone or otherwise communicate" with counsel and friends, should be excluded as a matter of law.

**10.** The ABA Standards Relating to Criminal Justice, the Defense Function § 2.1 provide:

> "Every jurisdiction should guarantee by statute or rule of court the right of an accused person to prompt and *effective* communication with a lawyer and should require that reasonable access to a telephone or other facilities be provided for that purpose." (*Emphasis added*).

disavowed. We hold that one intended purpose of AS 12.25.150(b) is to provide an arrestee with the opportunity to obtain legal advice.

We now must determine what the legislature intended when it gave an arrestee "the right to telephone or otherwise communicate with his attorney" "immediately after an arrest" in the context of a driving while under the influence (DWI) arrest. The state and the municipality argue the right to consult an attorney "immediately" means *after* any sobriety tests are administered. They argue that since the evidence which these tests are designed to detect dissipates quickly, it would be impracticable, unreasonable, and contrary to the intent of the implied consent statute [11] to allow prior consultation. We disagree. "Immediately" means just that. This "destruction of evidence" argument does not preclude the limited statutory right of access to counsel that Copelin and Miller are seeking.

In *Anchorage v. Geber,* 592 P.2d 1187 (Alaska 1979), we weighed the benefits of assistance of counsel against the possibility

that requiring such assistance following an arrest for driving while intoxicated and prior to field sobriety tests would interfere with the acquisition of relevant evidence.[12] *Id.* at 1192. We are mindful of the important state interest in obtaining reliable evidence of an arrestee's blood alcohol level and the fact that alcohol concentration will dissipate with the passage of time.

However, the proper procedure by which breathalyzer examinations are to be given in Alaska as set forth in 7 Alaska Admin. Code § 30.020 requires that the test subject be observed by the test operator for at least 15 minutes immediately prior to testing to assure that the subject does not vomit or place anything in his mouth which might invalidate the test result. Since a minimum of a 15 minute wait is necessary before administering the breathalyzer test, no additional delay is incurred by acceding to a request to contact an attorney during that time.[13]

 The statutory right to contact and consult with counsel is not an absolute one (which might involve a delay long enough

11. The Alaska Implied Consent Statute provides in part:
 "Sec. 28.35.031. Implied consent. A person who operates or drives a motor vehicle in this state shall be considered to have given consent to a chemical test or tests of his breath for the purpose of determining the alcoholic content of his blood if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating or driving a motor vehicle while under the influence of intoxicating liquor. The test or tests shall be administered at the direction of a law enforcement officer who has reasonable grounds to believe that the person was operating or driving a motor vehicle in this state while under the influence of intoxicating liquor."

12. *Geber* does not directly control this case. In *Geber* one of the defendants argued unsuccessfully that before requiring her to perform certain field sobriety tests, the police should have informed her that she had the right to have an attorney present if she could obtain his presence within a reasonable period of time. While we held that the police have no duty to advise a suspect of any right to counsel, we did not hold that the police may refuse the specific requests to contact counsel that were made in the instant cases. Other courts have recognized that there is a vast difference between a flat refusal

to afford access to counsel after it is requested and a failure to advise or warn a defendant of his rights. *See, e.g., People v. Craft,* 28 N.Y.2d 274, 321 N.Y.S.2d 566, 270 N.E.2d 297 (N.Y. 1971). Secondly, while we held in *Geber* that there is no right to have an attorney *present* at the field sobriety tests, we did not hold that there is no right merely to contact or communicate with counsel before deciding whether or not to submit to such test. Other jurisdictions, while finding a constitutional or statutory right to consult an attorney by phone, have held that the arrestee does not have the right to demand physical presence of the attorney before taking a breathalyzer test. *Spradling v. Deimeke,* 528 S.W.2d 759, 765 (Mo.1975); *Price v. North Carolina Dept. of Motor Vehicles,* 36 N.C.App. 698, 245 S.E.2d 518, 521–22 (N.C.1978); *McNulty v. Curry,* 42 Ohio St.2d 341, 328 N.E.2d 798, 803 (Ohio 1975). *Geber* dealt with neither the statutory right to counsel nor the administration of a breathalyzer test.

13. While 15 minutes is the minimum period of delay, the arrestee will have a longer period of time in which to contact his attorney where the test operator is not yet ready to administer the test. Such a rule does not impose any greater delay in testing other than that which is inherent in the test administration process.

to impair testing results), but, rather, a limited one of reasonable time and opportunity that can be reconciled with the implied consent statutes.[14]

■ The municipality argues that it is not clear whether Miller would have been able to contact his attorney within any specific time period. The state points out that Alaska does not by statute establish a period of time during which the breathalyzer must be administered to guide the court in prescribing a time limit. Both of these observations are valid. Reasonableness will depend on the circumstances of each case, such as the amount of time between the stop and the transportation to the station, when the request is made, and how much time is needed to set up the test. If the attorney cannot be contacted within a reasonable time the suspect must decide without the advice of counsel, whether to take the breathalyzer test.[15] As both Copelin and Miller were denied any opportunity whatsoever to contact their attorneys, they were denied their statutory rights.

The state and the municipality next contend that since there is "no right to refuse" to take the breathalyzer tests, any right to consult an attorney would be meaningless to the accused. In *Graham v. State,* 633 P.2d 211 (Alaska 1981), we stated:

"Under Alaska law, as in most other jurisdictions, one arrested for operating a motor vehicle while under the influence of intoxicating liquor has no constitutional or statutory right to refuse to submit to a breathalyzer test. *Palmer v. State,* 604 P.2d 1106, 1110 (Alaska 1979); *Wirz v. State,* 577 P.2d 227, 230 (Alaska 1978). Nor does he or she have the right to have

counsel present before being required to take the test. *Anchorage v. Geber,* 592 P.2d 1187, 1192 (Alaska 1979). Since there is no right of refusal, we have also held that it is not necessary to inform the person arrested that he or she can refuse the test, in order to render the test results admissible. *Palmer v. State,* 604 P.2d 1110."

*Id.* at 214 (footnote omitted).

The prosecuting authorities in the present case have seized upon the language that there is "no right to refuse" to take the breathalyzer test to argue that there is no issue as to which the advice of an attorney might help to preserve any of the accused's rights. The state goes a step further, insisting that it cannot conceive of any ethical or lawful assistance which a criminal defense attorney could render for a client arrested for drunk driving who is asked to take a breathalyzer test.

■ These arguments misperceive what is meant by "no right to refuse." There may be no right to refuse a test for determining blood alcohol level in the constitutional sense. *See Schmerber v. California,* 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966). And, there may be no right to refuse in the statutory sense, in that the arrestee will suffer adverse legal consequences in the form of suspension or revocation of his driver's license. AS 28.-35.032. However, the statute does not deprive an accused of the power to refuse to submit to the test: if the suspect refuses to submit to a breath test, *no* chemical analysis of his breath, blood, or urine may be given. *Anchorage v. Geber,* 592 P.2d 1187 (Alaska 1979) (interpreting AS 28.35.032).[16]

---

**14.** The burden of proof is on the government to show that an accused demanded an unreasonable amount of time and thereby interfered with the "prompt and purposeful investigation" of the case. *Blue v. State,* 558 P.2d 636, 642 (Alaska 1977).

**15.** Although an arrestee may be without the advise of counsel, he is entitled to a warning by the police. The police are not required to inform the arrestee that he has the right to refuse; however, if he does refuse, he must be advised of the consequences flowing from his

refusal and be permitted to reconsider his refusal in light of that information. *Wirz v. State,* 577 P.2d 227 (Alaska 1978).

**16.** The legislature has recently amended AS 28.35 by adding a new section, AS 28.35.035. Under subsection (a) of this new section, an arrestee who causes death or physical injury to another person no longer has the ability to refuse chemical testing of his blood or breath. The tests may be administered without the consent of the arrestee. Subsection (b) of the new section provides that where the arrestee is un-

Therefore, the law has deliberately given the arrested person a choice between two very different alternatives and potential sanctions. The arrested driver must weigh and evaluate a number of different factors. He may only be vaguely aware of some of these and need not be informed of all of them by the police.[17]

The decision as to whether to comply with an arresting officer's request to take a sobriety test is not a simple one. Clearly, an attorney's advice at this stage would not only be ethical and lawful, but helpful. The choice which an individual driver must make is a meaningful and binding one that will affect him in subsequent proceedings. Where the important chemical testing procedures are not unreasonably delayed, the driver should, upon request, have the benefit of the advice of his own counsel, with whom he has a statutory right to communicate. Given the conclusive nature of the evidence which the accused is asked to provide, this decisive point may be the *only* occasion when this statutory right is of any use.

The prosecuting authorities finally argue that to apply the statutory right to commu-

---

conscious or otherwise incapable of refusal, the implied consent of AS 28.35.031 remains operative, and the police may conduct chemical testing of breath or blood. Such an arrestee would have no effective choice to refuse testing.

The holding in this case, that an individual has the right to telephone an attorney prior to deciding whether to take the breathalyzer test, is restricted to those cases in which the arrestee, under AS 28.35, is still left with the choice of refusing to take the breathalyzer test.

17. Among the possible ramifications under present law (effective January 1, 1983):

A. If the driver refuses to take the breathalyzer test:

1. A chemical test cannot be given unless the arrest results from an accident that causes death or physical injury to another person. AS 28.35.035(a).

2. The driver's license or nonresident privilege to drive will be revoked or suspended for three (3) months, AS 28.35.032(b), if:

a. the arresting officer had reasonable grounds to believe the driver had been operating a motor vehicle while under the influence; if

b. the driver refused to submit after being advised this would result in suspension or revocation of his license; and if

c. the driver was fairly informed of the nature and accuracy of the test, the expertise of operator, etcetera.

3. If the driver who refuses has been convicted of driving while intoxicated or of refusal to submit to a breath test the suspension or revocation will be for one (1) year. AS 28.35.032(d).

4. Refusal to submit to the chemical test of breath is a class A misdemeanor. AS 28.35.032(f). Conviction for refusal carries a minimum sentence of imprisonment of not less than 72 consecutive hours. And, upon a subsequent conviction within five years after such a conviction or of a conviction for driving while intoxicated in this or any other state, the minimum sentence is ten consecutive days unless the subsequent conviction is within one year of the previous conviction, in which case the minimum sentence is twenty consecutive days. In addition, a person convicted of this misdemeanor must enroll in a program of alcohol education or rehabilitation that the court finds appropriate. AS 28.35.032(g).

5. The driver may still be prosecuted for driving under the influence and convicted, despite his refusal to take the breathalyzer test. The driver's refusal to submit to the breathalyzer test, as well as any other field sobriety test, *will* be admissible evidence in a civil or criminal proceeding under the revised statute. AS 28.35.032(e).

6. Refusing to submit to a breathalyzer may hinder the state's case against a driver, but it may also deprive the driver of exculpatory evidence.

7. A driver who receives a refusal suspension can obtain a limited license by instituting a separate civil action and demonstrating to the court requisite hardship. AS 28.35.-032.

8. There may be serious collateral consequences to a suspension, involving one's driving record, insurance premiums and even employment.

B. If the driver takes the breathalyzer test:

1. Under ANCHORAGE, ALASKA MUNICIPAL CODE § 9.28.020 B.2 and the revised AS 28.35.030(2), a reading above .10 is conclusive proof of driving while intoxicated. On the other hand, a low breathalyzer reading can establish innocence under AS 28.35.-033(a)(1) and ANCHORAGE, ALASKA MUNICIPAL CODE § 9.28.023 A.1.

2. A person who submits to a breathalyzer test may have a qualified person of his own choosing administer a chemical test in addition to the chemical test administered at the direction of a law enforcement officer. AS 28.35.033(e). There is no requirement that the driver be advised of this right. *Palmer v. State,* 604 P.2d 1106 (Alaska 1979).

nicate with one's attorney at the pre-decision stage would thwart the legislative intent underlying the implied consent statute. The courts in a growing number of jurisdictions recognize at least a limited right to communicate with counsel prior to making the decision to submit to chemical testing. While many of the cases cited in the briefs can be distinguished on significant statutory differences, see *Wirz v. State*, 577 P.2d 227, 230 n. 12 (Alaska 1978), some cases have found a predecision right to communicate with counsel based upon state statutes similar to AS 12.25.150(b) or court rules similar to Criminal Rule 5(b). These cases have found no inconsistency between these statutes and court rules and implied consent statutes.[18] The prosecuting authorities have failed to cite and we have failed to find any case that denies a limited statutory right to counsel if a statute similar to AS 12.25.150(b) or Criminal Rule 5(b) exists.

### Exclusionary Rule

The question remains as to whether denial of a statutory right to counsel requires the suppression of subsequently obtained evidence. Copelin and Miller argue that invocation of the exclusionary rule is appropriate for violations of AS 12.25.150(b) even though there is no provision for doing so in the statute and the statute itself provides for civil and criminal sanctions. The state argues that the exclusionary rule is reserved for constitutional violations, and that since this remedy was not included in the statute, it was not thought by the legislature to be appropriate.

In *State v. Sundberg*, 611 P.2d 44 (Alaska 1980), we elected not to apply the exclusionary rule to a violation of AS 12.25.080 (forcible arrest statute). While noting that the primary purpose of the exclusionary rule is deterrence of future illegal conduct by police, we also concluded that other deterrents might render adoption of an exclusionary rule unnecessary, given society's interests in crime prevention and the apprehension and trial of offenders. *Id.* at 52. Given those considerations and the absence of a history of excessive force in arrests by police officers, we concluded that the imposition of the exclusionary rule for violations of the forcible arrest statute would at best achieve only a marginal deterrent effect.

Under a *Sundberg* analysis we reach the opposite conclusion with regard to AS 12.25.150(b). In *Sundberg* we distinguished the forcible arrest situation from a "conventional search and seizure . . . involv[ing] a relatively static factual circumstance where the object of police efforts is to obtain evidence of criminal conduct." *Id.* The breathalyzer test, in contrast to the hot pursuit of fleeing felons, provides time for reflection before action and, like a traditional search, consists of intentional efforts by the police to obtain evidence. Given these distinguishing factors, we believe that application of the exclusionary rule will serve to deter future illegal police conduct.

Additionally, a violation in this type of case, as opposed to a violation of the forcible arrest statute, has an effect on the defendant's ability to present a defense at

---

18. *State v. Vietor*, 261 N.W.2d 828, 830–31 (Iowa 1978) (Statute required peace officer to "permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of his or her family or an attorney of his or her choice."); *Prideaux v. State Dept. of Public Safety*, 310 Minn. 405, 247 N.W.2d 385, 391–94 (Minn.1976) (Statute required officer to "admit any resident attorney retained by or on behalf of the person restrained, or whom he may desire to consult, to a private interview at the place of custody."); *Gooch v. Spradling*, 523 S.W.2d 861, 865–66 (Mo.App.1975) (Statute and court rules provided the right "to consult with counsel or other persons in his behalf at all times"); *McNulty v. Curry*, 42 Ohio St.2d 341, 328 N.E.2d 798, 802–

03 (Ohio 1975) (Statute required that "[a]fter the arrest, detention, or any other taking into custody of a person . . . such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state . . ."); *State v. Fitzsimmons*, 94 Wash.2d 858, 620 P.2d 999 (Wash.1980), *aff'g*, 93 Wash.2d 436, 610 P.2d 893 (Wash.1980) after vacation of judgment and remand in 449 U.S. 977, 101 S.Ct. 390, 66 L.Ed.2d 240 (1980). (Court rule required that "[a]t the earliest opportunity a person in custody who desires counsel shall be provided access to a telephone . . . and any other means necessary to place him in communication with a lawyer").

trial. Here, the defendants were deprived of their statutory right to counsel, and evidence gathered after the right to counsel has been denied should be excluded from trial. *See Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In deciding to apply the exclusionary rule in a situation similar to that presented here, the Minnesota Supreme Court stated:

"[W]hat sanctions should attend violation of the right? While we note that § 481.-10 contains civil and criminal penalties against the police officer, these alone are not sufficient to fully vindicate the driver's right. When the driver has been coerced into making a complicated decision without the assistance of counsel required by this opinion, he should not be bound by that decision, since he might have otherwise made it differently. Therefore, if such a driver elected to take the test, the results should be suppressed. If he elected not to take the test, he should not be deemed to have unreasonably refused it and his driver's license should not be revoked."

*Prideaux v. State Dept. of Public Safety,* 247 N.W.2d at 395.

Application of the exclusionary rule to Miller requires that the breathalyzer test results be suppressed. Copelin, however, presents a more difficult case. The State argues that the evidence against Copelin was *"de facto* suppressed" since Copelin refused to take the test, and the portion of the videotape having to do with his refusal was not heard by the jury. However, we conclude that the videotape evidence of his actions after he requested to speak with his attorney should have been suppressed entirely. Had he been allowed to consult with an attorney he may have elected to take the breathalyzer, and gained exculpatory evidence. Furthermore, had he been granted the right to consult with his attorney, it is likely that the videotaped events (his grow-

ing anger at not being able to talk with his attorney and his consequent verbal abuse of the police officer) would never have occurred.

■ In conclusion, we find that when a person is arrested for operating a motor vehicle while intoxicated and asks to consult a lawyer, AS 12.25.150(b) and Criminal Rule 5(b) mandate that the arrestee be afforded the right to do so before being required to decide whether to submit to a breathalyzer test. If the suspect is denied that opportunity, subsequent evidence, whether in the form of the test results or the refusal to submit to it, shall be inadmissible at a later criminal trial. This statutory right is limited, however, to circumstances when it will not unreasonably hinder the police investigation. If the person arrested is unable to reach an attorney by telephone or otherwise within a reasonable time, the accused may be required to elect between taking the test and refusing it without the aid of counsel. As both Copelin and Miller were denied the opportunity to contact counsel, these cases must be REVERSED.[19]

COMPTON, Justice, dissenting in part.

I disagree with the court's holding that evidence obtained subsequent to a refusal to allow an OMVI suspect to contact counsel in violation of AS 12.25.150(b) must be excluded. In support of this result, the court relies on *State v. Sundberg,* 611 P.2d 44 (Alaska 1980). I believe that *Sundberg* and other Alaska cases discussing the exclusionary rule support the opposite conclusion.

Determining whether an exclusionary remedy is appropriate requires a balancing of the purpose behind excluding illegally obtained evidence with the interest in admitting reliable evidence in those proceedings. *State v. Sears,* 553 P.2d 907, 912 (Alaska 1976) (applicability of exclusionary remedy in probation revocation proceedings). The primary purpose of the exclu-

19. As we have concluded that Copelin and Miller's statutory rights were violated and that evidence obtained subsequent to these violations must be suppressed, we need not consider the argument that an accused has a constitutional right to consult with counsel prior to deciding whether to submit to intoxication tests.

Our decision to reverse also eliminates the need to address Copelin's argument that the district court erred in imposing his sentence.

sionary rule is deterrence of future illegal conduct by the police. *Sundberg,* 611 P.2d at 51 (footnote omitted). The rationale of this rule is that if the police are aware that the fruits of their illegal conduct will be excluded from trial, then the police will cease such conduct.

After noting the existence of potential deterrents in criminal sanctions, police departmental proceedings, civil rights actions, and tort suits, we concluded in *Sundberg* that an exclusionary rule would not provide significant additional deterrence to excessive force arrests. *Id.* at 51–52. In the present case, there are additional reasons why an exclusionary remedy is not necessary for violations of AS 12.25.150(b).

First, unlike the situation in *Sundberg,* where there were no built-in sanctions for violations of the forcible arrest statute, AS 12.25.150 clearly and expressly sets forth both criminal and civil sanctions against police for the deprivation of an arrestee's rights under the statute. AS 12.25.150(c) provides:

> It shall be unlawful for any officer having custody of a person so arrested to wilfully refuse or neglect to grant any prisoner the rights provided by this section. A violation of this section is a misdemeanor, and, upon conviction, the offender is punishable by a fine of not more than $100, or by imprisonment for not more than 30 days, or by both.

AS 12.25.150(d) provides:

> In addition to the criminal liability in (c) of this section, an officer having a prisoner in custody who refuses to allow an attorney to visit the prisoner when proper application is made therefor shall forfeit and pay to the party agrieved the sum of $500, recoverable in a court of competent jurisdiction.

Thus, the legislature created a statutory right to "telephone or otherwise communicate" with counsel immediately after arrest, AS 12.25.150(b), and provided deterrence for violations of this right by authorizing criminal prosecution of a police officer for willfully refusing or neglecting to allow an arrestee to exercise this right. An officer

convicted under this statute has a misdemeanor on his record, faces a fine up to $100 and/or imprisonment up to thirty days, and faces a civil judgment of $500 payable to the aggrieved arrestee.

Second, unlike the potential deterrents discussed in *Sundberg,* the criminal sanction would simply require the arrestee to make a criminal complaint. The state would be charged with the good faith obligation to investigate and, if warranted, to prosecute and bear the cost of such prosecution; a judge would determine the degree of punishment rather than an interested police department official; there would not be the time delays associated with civil suits. I believe that a police officer would more likely be deterred by the potential criminal record and jail time than by application of the judicially created exclusionary rule, which simply means that one of the officer's many arrests failed to culminate in a conviction. Therefore, it is clear that the minimal, if any, deterrent effect that an exclusionary remedy would have considering the civil and criminal deterrents already built into AS 12.25.150 is far outweighed by the significant interest in admitting probative evidence gained from a breathalyzer test.

*Sundberg* implies an additional reason for not imposing an exclusionary remedy for violations of the excessive force statute, namely, when the officers are acting in good faith:

> [W]e are of the view that imposition of the exclusionary rule on the particular facts of the case at bar was clearly unwarranted ... [because] the officer ... was proceeding in accordance with existing departmental directives, and the degree of force permissible under the necessary and proper phraseology of AS 12.25.-080 had not been previously construed by this court.

611 P.2d at 52 (footnote omitted).

In this case, the police quite likely believed in good faith that Miller and Copelin had no right to consult counsel before taking the breathalyzer. Even the court of appeals, relying on *Eben v. State,* 599 P.2d

700, 710 n. 27 (Alaska 1979), understood AS 12.25.150 to be merely a bail statute and therefore believed it was not applicable in the context of an arrest followed by a breathalyzer test administration. *Copelin v. State*, 635 P.2d 492, 493–94 (Alaska App. 1981). Thus, this is not a situation where the police acted in blatant disregard of an individual's constitutional and statutory rights; rather, they were engaged in conduct that they reasonably believed was legal. Only after this decision is published and the police become aware that an individual *does* have a limited statutory right to consult an attorney prior to taking a breathalyzer test does the deterrence rationale become operative.

In short, application of the exclusionary rule is intended to deter *future* illegal conduct. This deterrence is amply provided by the decision in this case, which makes it clear for the first time that the conduct is illegal, and by the criminal sanctions imposed by the legislature for officers engaging in the illegal conduct.

The court's holding ignores these two significant factors of *Sundberg* militating against applying an exclusionary remedy and attempts to distinguish this case from *Sundberg* on the ground that the breathalyzer situation is more like a " 'conventional search and seizure ... involv[ing] a relatively static factual circumstance where the object of police efforts is to obtain evidence of criminal conduct.' " 659 P.2d at 1214 (quoting *Sundberg*, 611 P.2d at 52). Given that administration of a breathalyzer test "provides time for reflection before action" and that "like a traditional search, [it] consists of intentional efforts by the police to obtain evidence," *id.* the court opinion concludes that an exclusionary remedy is needed as an additional deterrent. It neglects to state, however, that *Sundberg* distinguished conventional search situations on the ground that "the fleeing offender—arrest situation ... often requires law enforcement officials to make rapid decisions within the framework of fluid and confused factual situations which do not permit significant reflection, the obtaining of legal advice, or the intervention of, and decision

from, a neutral and detached judicial officer." 611 P.2d at 52. I believe that the breathalyzer situation is in reality somewhere between the "traditional search" situation and the "hot pursuit" circumstance. Although the factual situation is not likely to be as "fluid and confused" as hot pursuit, the police officer is nonetheless going to have to make an educated guess, without help from counsel, whether a "reasonable time" has passed so that he may put the suspect to his choice. At this point, with no evidence to the contrary, I think the court must assume that such a decision will be made in good faith by law enforcement personnel.

In other words, application of the exclusionary rule at this stage is premature. As we stated in *Sundberg:*

> [W]e think it appropriate to caution that our holding is not immutable. In the event a history of excessive force arrests is shown, demonstrating that existing deterrents are illusory, we will not hesitate to reexamine the question of whether an exclusionary deterrent should be fashioned in the situation where evidence is obtained as a result of an arrest which is effectuated by excessive force.

*Id.* (footnote omitted). *Cf. Elson v. State*, 659 P.2d 1195, 1205 n. 31 (Alaska 1983) (same cautionary instruction given after permitting illegally seized evidence to be used in sentencing proceedings). Similarly, in the event that the clearly delineated statutory right to consult with counsel is violated in the future and that the civil and criminal sanctions are shown not to deter these violations, then this court should not hesitate to apply the exclusionary rule.

I join the court's disposition of all other issues in the petition for hearing.

BURKE, Chief Justice, dissenting in part.

I share the views expressed by my dissenting colleague, Justice Compton. At this point in time, we have no reason to believe that the penalty provisions of AS 12.25.150 will not be vigorously enforced,

now that the requirements of the statute have been made clear. Nor is there reason to believe that those provisions will not effectively deter future violations of the statute. If and when it can be demonstrated that the police and the prosecuting authorities are shirking their responsibility, or that the deterrent effect of the penalty provisions is illusory, we should not hesitate to apply the exclusionary rule. In my judgment, however, the court's application of the rule at this time is unwarranted.